UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CASE NO. 3:25CR222 (KAD) |
| | : | |
| v. | : | |
| | : | |
| SALIM SAKAL | : | June 15, 2026 |

## **GOVERNMENT'S SENTENCING MEMORANDUM**

There are many mysteries surrounding the defendant, Salim Sakal, including his true financial circumstances, his interests in multiple businesses, the true nature of his family and health circumstances, and even the sincerity of his remorse. But this much is clear: Without fences like Sakal, organized retail theft networks like the conspiracy charged in *United States v. Ramirez Cagua*, 3:24CR149 (KAD), would not have an easy outlet to profit from their serious crimes. Indeed, after most of the jewelry burglaries committed as part of the conspiracy, these co-conspirators traveled from Indiana, New York, Connecticut, Illinois, New Jersey, and Virginia to Queens so that they could visit Sakal at his store, Ramoun Jewelry, to cash out their crime. The losses from these burglaries totaled nearly $2.5 million. PSR ¶ 19; Plea Agmt. at 12 ¶ 6.

Given the Court's thorough familiarity with the offense conduct, the government will not recount it here. Rather, this sentencing memo will address four issues: (1) Sakal's murky financial disclosures; (2) his planned restitution payments; (3) his claim that he "simply did not think it through" when engaging in the offense conduct; and (4) Sakal's other mitigating arguments and circumstances. The government will then briefly discuss the application of the sentencing factors under 18 U.S.C. § 3553(a).

1

For the reasons discussed below, the Court has been provided no reasons why a Guidelines sentence of 37 to 46 months is not fair, just, and appropriate in this case. Indeed, there are ample reasons to impose such a sentence.

## I.      Sakal's Opaque Financial Disclosures

Sakal did not submit his completed personal financial statement until June 11, 2026, although it was signed on May 27, 2026, after the final PSR has been disclosed. *See* PSR Third Addendum. In his PFS, Sakal disclosed—for the first time—that he owns 18% of David Star Jewelry, aka Ramoun Jewelry, while his brother Aizak purportedly owns 82% of the business. *See* Personal Financial Statement at 4, 5. Even though Sakal is an owner of Ramoun, he curiously does not disclose any business income. *See* Monthly Cash Flow Statement at 2. There are several additional issues with Sakal's financial disclosures in this case:

- Sakal claims to make "approximately" $4,000 in gratuities/tips a month, although the nature of this monthly income is unclear. *Cf.* Sealed Ex. 1 at 6 (listing $4,000 a month as "other" income). The PSR notes that "Mr. Sakal's brother, Isaac [sic] financially supports Mr. Sakal and assists with paying for groceries," PSR ¶ 72, but it is not clear whether this financial support consists of any or all of the $4,000 a month listed. It is also not clear whether all or part of Sakal's $2,000 monthly expenditures in groceries—Sakal's largest monthly expense, *see* Monthly Cash Flow Statement at 3—is paid for by Sakal's brother or whether instead Sakal pays for those groceries on his own.

- He claims that he has filed income tax returns for all years he was required to do so. PSR ¶ 73. However, he has not—to the government's knowledge—provided any such tax returns to the USPO. His Personal Financial Statement indicates that the last year he filed his taxes was in 2023, *see* Personal Financial Statement at 5, but it is not apparent why he has not filed for 2024 or 2025 and, if he was not required to file, why that was the case.

- As the PSR notes, Sakal had access to a number of bank accounts during the offense period. PSR ¶ 78. It is not clear what interests, if any, Sakal had in each of the following, but these accounts are not disclosed anywhere in his Personal Financial Statement:

2

- o Bank of America checking account ending in 0713 in the name of David Star Jewelry Inc.
  - Sakal signed a signature card on March 23, 2023 as "Vice President."
  - Sakal would write checks out of this account.
  - The ending balance on this account on May 31, 2024 was $259,887.78.
- o J.P. Morgan Chase account ending in 1713 in the name of Shlomi Jewelry and Shoes Inc.
  - Sakal signed a signature card on February 22, 2016 as "President."
  - This account was closed and there was a withdrawal of $130,273.98 by Aizak Sakal.
- o J.P. Morgan Chase account ending in 3158 in the name of David Star Jewelry Inc.
  - Sakal signed a signature card on January 18, 2023 as "Secretary."
  - Sakal would write checks out of this account.
- o J.P. Morgan Chase account ending in 0359 in the name of Zuky LLC
  - Sakal was added as a signatory on February 6, 2023.
- o Interaudi Bank account ending in 9856 in the name of Zuky LLC
  - In the signature card for this account dated May 16, 2023, Sakal listed his employment as "Self employed."
  - Zuky LLC appears to be a real estate investment company owned by Aizak Sakal.

Sakal explains that he "ma[de] a mistake due to his financial problems." PSR ¶ 67; *see also* Def. Memo. at 2 (alluding to non-specific "financial pressures he was dealing with at the time"). Given that he lives rent free, *see id.* ¶ 72, has a positive monthly cash flow, and has no major debts, *see* Personal Financial Statement & Sealed Ex. 1, it is not clear what Sakal actually means by this statement. There is no information about or evidence to support the timing, nature, and extent of this claimed financial difficulty. Thus, it is difficult to assess the veracity of Sakal's claim that he is "not a wealthy man." Def. Memo. at 1.

## II.    Sakal's Restitution Payments

The circumstances surrounding Sakal's planned and avowed future restitution payments are equally opaque. While the government welcomes a payment of $250,000-$350,000 to the

victims on the date of sentencing as Sakal claims, *see* Def. Memo. at 1, the *source* of such monies remains a mystery.[1] Sakal suggests that he may have "raise[d], earn[ed], and … b[o]rrow[ed]" these funds, Def. Memo. at 2, but again, the provenance of this anticipated payment are not disclosed in his financial disclosures. *See* PFS at 7 (noting no debts other than credit card balances). The issue is not simply one of transparency, but material to the Court's consideration of Sakal's ability to pay restitution in the future. In other words, if is financially constrained by undisclosed debts that he owes others, he will be less able to make future restitution payments to the victims. *See* 18 U.S.C. § 3664(e) ("The burden of demonstrating the financial resources of the defendant and the financial needs of the defendant's dependents, shall be on the defendant.").

Sakal claims that he is committed to "making aggressive monthly payments of at least three thousand dollars a month even if he has to work harder to earn it." Def. Memo. at 2. This statement, however, begs additional, unanswered questions: *First*, if Sakal could have "work[ed] harder" to make more money, why has he not done so sooner? The government executed a search warrant on Ramoun/David Star Jewelry nearly a year ago, on July 31, 2025. Sakal has made no advance restitution payments to date, even though apparently nothing was preventing him from doing so. *Second*, given that Sakal reportedly makes $2,600 a month currently with little positive cash flow, *see* Monthly Cash Flow Statement at 2, it is not clear how he could work more to make a monthly payment of $3,000. *Third*, the Court may recall that, in late January

---

[1] Sakal requests that "the uninsured victims should be made whole immediately if possible." Def. Memo. at 3. Under 18 U.S.C. § 3664(i), "[i]f the court finds that more than 1 victim has sustained a loss requiring restitution by a defendant, the court may provide for a different payment schedule for each victim based on the type and amount of each victim's loss and accounting for the economic circumstances of each victim." The government takes no position on whether a different payment schedule other than a pro rata basis is appropriate in this case.

2026 and shortly before his scheduled waiver and plea hearing, Sakal decided to travel with his family to Cancun, Mexico, without notifying his counsel. It is not clear how Sakal was able to afford such a family vacation. The money spent on the trip could have been paid toward restitution, but it appears Sakal prioritized his needs over those of the victims of his crime. Thus, where there has been discretionary spending during the pendency of this investigation, as was the case for the Cancun trip, it belies Sakal's claims of genuine remorse.

Finally, Sakal claims that the government "has confiscated approximately one million dollars' worth of jewelry" from Ramoun during the execution of the July 31, 2025 search warrant. Def. Memo. at 4. Sakal asks that the value of those seized items be applied towards any outstanding restitution. *Id.* The government does not object to this request and, in fact, it has thus far not pursued forfeiture proceedings against the jewelry in an effort to facilitate faster payment of restitution to the victims upon any liquidation.[2] The government seized what it believed to be evidence of stolen merchandise (including pieces of gold), but it has not obtained an independent appraisal of these items because it is holding them as evidence in the case. Other than Sakal's own statement, however, there is no corroboration in the record that the seized jewelry is worth "approximately one million dollars[]."[3]

---

[2] In contrast, the government has initiated forfeiture proceedings in the seizure of $52,875 in cash from Ramoun.

[3] On or about December 2, 2025, Sakal produced a draft appraisal of the seized items to the government. The identities and qualifications of the appraiser(s) were not disclosed and the actual seized items were not individually evaluated. The draft summarily concluded that the total wholesale value of the seized items was $876,110.00 and the total retail value of the seized items was $1,473,780.00.

### III.    As a Crime Victim Himself, Sakal Understood the Impact of His Offense Conduct.

As the Court well knows, the victim impact from these burglaries has been severe and, in some cases, life altering. The victim of the Henrico, Virginia burglary, for example, recounts how the burglary "has set us back nearly a decade and forced us to delay our retirement plans." PSR ¶ 23. Other victims state that this crime exacerbated health problems and adversely impacted pregnancies. *See id.*; PSR ¶ 21 ("I was pregnant [during the burglary] and for [the] whole pregnancy I suffered from complications like prediabetic hypertension pre eclampsia due to having mental[] depression"); PSR ¶ 27 ("The stress made my existing pancreatic disorder worse, causing complications with diabetes that I continue to struggle with. The emotional strain, financial pressure, and long work hours have all affected my wellbeing in ways that go far beyond the financial loss.").

Sakal alleges that "he simply did not think it through when purchasing the stolen items. The 'victims' part of purchases he was making simply did not enter his mind at the time." Def. Memo. at 2. This is a surprising statement, considering that Sakal himself was the victim of not one, but three jewelry burglaries/robberies himself at Ramoun.

In or about January 2019—i.e., before Sakal's involvement in the offense conduct in this case—Ramoun was burglarized and a significant portion of the inventory stolen. Burglars reportedly gained entry one night to the store through the store's roof before cutting wires to its surveillance equipment. The perpetrator(s) reportedly stole more than $1 million worth of merchandise. Sakal was interviewed on camera by a television news crew shortly after the burglary. He said to the reporter: "'I have five kids, my wife, and me,' Sakal said. 'I have my dad and my mom. I have my brother, six kids, and we eat and drink from this store, OK. And right

now, we don't know how we're going to cover." *Queens Jewelry heist: suspect breaks in through roof, steals 90 percent of store's inventory*, ABC7 New York (Jan. 25, 2019), available at https://abc7ny.com/post/suspect-breaks-in-through-roof-ransacks-nyc-jewelry-store/5106642/ (last visited June 15, 2026). A NYPD police report of the incident further indicates that Ramoun had previously been burglarized in May 2016. *See* Sealed Ex. 2.[4]

Nearly five years later, on November 5, 2023, Sakal was the victim of an armed robbery at Ramoun. According to the NYPD police report of the incident, perpetrators displayed a black firearm and discharged it inside the store before taking off with stolen merchandise on a moped. The amount stolen was unknown at the time of the report. Fortunately, Sakal was not injured. *Id.* at 2. The case was eventually charged federally out of the Eastern District of New York. *See United States v. Franco Alexander Peraza Navas*, Case No. 1:23CR396 (MKB). Although Navas was indicted for a string of carjackings and Hobbs Act robberies, he pled guilty to the Ramoun robbery and faces sentencing on June 30, 2026.

Notably, Sakal had purchased stolen jewelry from the Henrico, Virginia burglary from Harold Ramirez Cagua, Jorge Escobar Gonzalez, Yesenia Melendez Rincon, Edixon Rincon Puentes, and others *on the same day as the armed robbery at Ramoun*. Indeed, some of the members of the *Cagua* conspiracy witnessed some or a portion of the robbery. Yet, even after being the victim of that armed robbery, Sakal continued to deal with his co-defendants and purchased stolen jewelry from them months later, in April 2024, after they burglarized a jewelry store in Horseheads, New York. Thus, it is difficult to believe Sakal's declaration that "at the time he was making the purchases he did not envision the possibility of the harm suffered by the

---

[4] The police report indicates that the loss "proved" was only $100,000, but in any case, it appears an arrest was made in the case. Sealed Ex. 2 at 1, 2.

victims in this case." Def. Memo. at 2. Sakal almost certainly *did* recognize the harm—since he himself was a repeated victim at the hands of others—yet decided to continue participating in the instant conspiracy. This is an aggravating factor the Court should consider under § 3553(a).

**IV.     Sakal's Other Mitigating Arguments and Circumstances Do Not Counsel for a Variance or Non-Guidelines Sentence.**

Sakal advances a number of other mitigating arguments in his sentencing memo, both about the offense conduct as well as his personal history and circumstances. With regard to the former, Sakal claims that "[s]ome of the items he purchased from the co-conspirators in this case were counterfeit goods that he paid [a] premium for and … still has in his possession for display." Def. Memo. at 4. The government is not aware what these alleged counterfeit goods were, how much Sakal allegedly paid for them, or the relevance of such facts—even if established—at sentencing. Sakal also claims that "[t]he items he did purchase[] were only slightly discounted." *Id.* Given that Sakal would pay tens of thousands of dollars in cash to the co-conspirators when any particular burglary resulted in six-figure losses, it appears that any discount Sakal applied was indeed significant. *Compare* PSR ¶ 14 *with* PSR ¶ 19. This is corroborated by two controlled sales the government conducted in July 2025, when Sakal paid cash for purportedly stolen gold jewelry presented by confidential human sources at a significant discount.

With regard to his personal history and characteristics, Sakal appears to have suffered significant anti-Semitism in Syria, which also affected his educational opportunities. PSR ¶¶ 54, 56, 59, 68. He has a child with non-verbal autism, but that child has an IEP in place that includes a 12-month program and a full-time paraprofessional. PSR ¶ 60. Sakal also has a significant number of family in the nearby area. PSR ¶ 56. While Sakal also alleges experiencing challenges

with his older son and his wife's health, those concerns are not corroborated by documentary evidence. PSR ¶ 102. Further, he claims to be a man of devout faith embedded in his community, *see* Def. Memo. at 2, but there is no evidence of that faith in the PSR or in his sentencing memorandum other than his bare assertions. Similarly, Sakal appears to have some medical conditions and a history of depression, *see* PSR ¶¶ 63, 66, but none of these conditions appear to significantly affect his quality of life or otherwise explain his conduct. Thus, on balance, there is nothing in Sakal's personal history or characteristics that would warrant a variance—much less the dramatic one he requests—from the advisory Guidelines range.

## V.      Application of § 3553(a) Factors

The most pertinent factors under 18 U.S.C. § 3553(a) in this case are the goals of promoting respect for the law, providing general deterrence, and reflecting the seriousness of the offense conduct and providing just punishment.

*Seriousness of the conduct and just punishment.* The Court is already familiar with the devastating victim impact and the broad, sophisticated, and organized nature of the conspiracy. Sakal, however, is different from the other co-conspirators charged in related case 3:24CR149. *First*, he took less risk than the others. He did not physically burglarize the stores, shatter display cases, drill through safes, or punch holes through walls to commit this crime. As such, Sakal holds a different—and perhaps more privileged—position in the conspiracy than lower-level co-conspirators such as Yesenia Melendez Rincon and Edixon Rincon Puentes, who this Court sentenced to 24 and 42 months in prison, respectively. On the flip side, Sakal captured a greater relative share of the profits, since he did not need to split his proceeds, as the other co-conspirators did. *Second*, whereas each burglar played a distinct role to help ensure the success

9

of the conspiracy, the role of the fence is less fungible. Sakal operated a store that welcomed his co-conspirators so that he could purchase stolen jewelry to resell for a presumed profit, including to third parties that he knew would melt down the gold. PSR ¶ 17. While Sakal was not the only fence in the conspiracy, he was its most frequently used. Indeed, Sakal purchased stolen jewelry in seven of the nine burglaries identified by the government as part of this conspiracy. *Compare* PSR ¶ 19 *with* Doc. No. 198 at 24 (listing all nine burglaries).

*General deterrence*. Given that fences are generally one step removed from the underlying thefts and thereby more insulated from criminal liability, general deterrence is an even more important consideration in such sentencings. At bottom, criminal cases brought against individuals like Sakal are more difficult to prove because the government must prove the defendant's knowledge. When they do face sentencing, however, the Court must send a message to all current and would-be fences that knowingly purchasing stolen merchandise is not only wrong, but will result in serious consequences. Any sentence must deter both burglars and fences from feeding similar organized retail crime.

*Promoting respect for the law*. For similar reasons, a Guidelines sentence is necessary to promote respect for the law. Sakal's conduct occurred on top of the multiple violations of city and state law. For example, he conducted the illicit purchases from the *Cagua* co-conspirators when Ramoun did not have a valid second-hand dealer license required under New York City laws and regulations. PSR ¶ 15. He also did not keep or make records for the transactions, including taking the identification and other information of the sellers. PSR ¶ 16. He did not list or describe the items purchased and he did not record the date and time of the purchases. *Id.* These underlying violations made it more difficult to investigate and uncover the instant offense.

The open flouting of laws designed to help protect legitimate consumers and sellers only further erode trust in the legitimacy of second-hand stores, pawn shops, and resellers. Thus, a meaningful sentence here is necessary to help ensure that business owners in these areas comply with their legal obligations rather than expand the illicit market even further. In contrast, the probationary sentence Sakal seeks would promote *disrespect* for the law, because it would endorse the view that white collar defendants s who can afford retained counsel will not be meaningfully punished while the "street level" co-conspirators who commit the actual thefts face greater sanctions.

## CONCLUSION

For the reasons stated above, Sakal should receive a Guidelines sentence. The Court should also order restitution to the victims in the amount of $2,417,457.

Respectfully submitted,

DAVID X. SULLIVAN
UNITED STATES ATTORNEY

*/s/ David T. Huang*
DAVID T. HUANG
ASSISTANT U.S. ATTORNEY
Federal Bar No. ct30434
157 Church Street, 25th Floor
New Haven, CT 06510

11